United States Court of Appeals,

Fifth Circuit.

No. 93-2043.

Lee Douglas HAGAN, et al., Plaintiffs-Appellees,

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT, et al., Defendants,

Eddie Orum, III, Defendant-Appellant.

April 27, 1995.

Appeal from the United States District Court for the Southern District of Texas.

Before REYNALDO G. GARZA, GARWOOD and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs-Appellees in this case are three former students of Wheatley High School (WHS) in Houston, Texas, and their mothers. These students allege that they were sexually molested by their former high school coach, Tommy Reaux. The students and their mothers filed suit against several defendants, including the principal of WHS, Eddie Orum, III, for failing to prevent Reaux's abuse. Orum now appeals the district court's denial of his motion for summary judgment based on qualified immunity. We reverse.

I.

In reviewing a denial of summary judgment we must consider the facts in the light most favorable to the non-movants, the Plaintiff-Appellees in this case (collectively, the "students"). *Doe v. Taylor Independent School District,* 15 F.3d 443, 446 n. 1 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994).

1

On September 12, 1989, Appellee Roland Major informed several WHS teachers that Reaux had pinched and patted him on the buttocks. One of these teachers sent Major to Appellant Orum, who interviewed Major and had him make a written statement. Orum then met with Reaux, who admitted that he had patted Major on the behind. Reaux told Orum that he had been trying to persuade Major to rejoin the football team and that the pat had simply been a "coaches' gesture." That same day, Orum met with Major and Reaux together. At this meeting, Orum told Major that because there were no witnesses to the incident, nothing further could be done.

Orum did not personally contact Major's mother to tell her of the incident. Later that afternoon, Reaux approached Major and asked if he could give Major a ride home after school so that Reaux could talk to Major's mother. Accompanied by another teacher, Reaux and Major went to Major's home. Reaux told Major's mother that he had patted her son on the buttocks and that Reaux, Major and Orum had already met and discussed it. At some later time, Orum warned Reaux that he should be careful in his gestures with students. Aside from this warning Orum did nothing further about Major's complaint.

On October 25, 1989, Appellee Cleveland McCord reported to several teachers that he had been having sexual relations with Reaux. One of these teachers took him to speak to Orum. Orum met separately with McCord and with Reaux, then met with them together. In Reaux's presence, Orum had McCord make a written statement. Orum also separately questioned Reaux, who denied McCord's

allegations.  Later that day, Orum tried to telephone McCord's mother, but could not reach her because the telephone number was either disconnected or incorrect.  Orum contacted an official with the Houston Independent School District (HISD) and relayed the information McCord had given him.  The HISD instructed Orum to get statements from McCord and Reaux and to prepare a written report.  The HISD also told Orum that William Morgan, the HISD District IX Superintendent, would begin an investigation.  Orum sent a written report to the HISD that day.[1]

Shortly afterward, Reaux approached McCord and offered him $50.00 to say that nothing had happened.  McCord took the money and on October 26 made a new written statement withdrawing his allegations.  When Orum questioned McCord about the reason for his change of heart, McCord told Orum that he just wanted to drop it.  Orum again contacted the HISD and informed them of McCord's new statement.  Orum told the HISD that he still considered the situation serious and stated that he had warned Reaux that, in spite of McCord's retraction, Orum would recommend that Reaux be fired if there was reason to believe the original charges.  At that point, Orum intended to discontinue his active investigation but to monitor the situation by "keep[ing] [his] eyes open."

---

[1]In their brief, the students "question the authenticity of these letters [to HISD] and their self serving purpose of attempting to exonerate [Orum]."  However, Orum has properly authenticated these documents.  In the face of Orum's competent summary judgment evidence, the students' unsworn skepticism is insufficient to raise a genuine issue of material fact as to whether the letters are authentic. *Johnston v. Houston,* 14 F.3d 1056, 1060 (5th Cir.1994).

Several days later, McCord told Orum that he wanted to revive his complaint. On November 1, Orum went to McCord's home to speak to his mother. Orum informed McCord's mother of McCord's allegations and told her that he had spoken with both McCord and Reaux. Orum also told McCord's mother that Reaux would no longer be allowed to be alone with students. This was apparently the first that McCord's mother had heard of this matter and she told Orum to hold off his investigation because she wanted to speak to her son first. The next morning, McCord's mother visited Orum's office, informed Orum that the relationship between Reaux and her son had been consensual and asked Orum to stop investigating. On that day, Orum wrote to Morgan and informed him that his investigation had been inconclusive and that he planned to end his inquiry unless he was instructed otherwise.

Some time in 1990, Orum was approached by Daphne Chappell, the band teacher at WHS, who suggested that he speak with a student named Earl Armstrong to see if Armstrong had been having problems with Reaux. Chappell told Orum that Armstrong's youngest brother had said that Reaux and Armstrong were having sexual relations. Orum spoke to Armstrong and to Reaux, both of whom denied the allegations. Orum also spoke to Armstrong's mother, who told him only that she was concerned that the WHS football and band departments were too aggressively vying for Armstrong's exclusive participation. At this time, Orum believed that some of the past allegations against Reaux might have been true, but because of the outcome of his interviews with Armstrong, Armstrong's mother and

4

Reaux, Orum concluded that he should take no further action.

Although Orum was aware that a number of alumni and faculty were discussing Reaux and insisting that he be fired, he was not notified of any new concrete complaint about Reaux until 1991. On April 23, 1991, appellant Lee Douglas Hagan reported to the campus police, several teachers and Orum that Reaux had rubbed his inner thigh, grabbed his penis through his pants and made a number of suggestive comments while Hagan was in the WHS coaches' office. After the District Attorney's Office brought formal charges against him, Reaux was removed from his position at WHS.

In their suit in federal court, the students brought claims under 42 U.S.C. § 1983 alleging violations of their civil rights, a claim under 42 U.S.C. § 1985 alleging a conspiracy to violate their civil rights, and a claim for violations of the Education for the Handicapped Act (EHA). The district court granted summary judgment to Orum on the EHA claim but not on the §§ 1983 and 1985 claims.

## II.

We review the district court's denial of summary judgment de novo. *King v. Dogan,* 31 F.3d 344, 345 (5th Cir 1994). We will reverse the denial if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.

### A. 42 U.S.C. § 1983

This court recently explained that "a supervisory school official can be held personally liable for a subordinate's

5

violation of an elementary or secondary school student's constitutional right to bodily integrity in physical sexual abuse cases if the plaintiff establishes that:

1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and

2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and

3) such failure caused a constitutional injury to the student."

*Taylor,* 15 F.3d at 454.

Orum contends that the students have not shown that they suffered a deprivation of their constitutional right to bodily integrity and that the students failed to meet every prong of the *Taylor* test. We do not address whether the students have shown constitutional violations because even if they have, we conclude that under the standard established in *Taylor,* Orum is entitled to qualified immunity.[2]

1. Major

To avoid Orum's qualified immunity defense, Major must show that: (1) Orum had learned of facts that pointed plainly toward a conclusion that Reaux had been molesting students; and (2) in the

---

[2]For this reason, we express no opinion as to whether the rights of schoolchildren described in *Doe* are implicated in the case of high school students who are no longer minors. In addition, we take no position as to whether a student who is above the legal age of consent can allege a constitutional violation based on wholly consensual sexual relations with a school teacher. For the purpose of this opinion, we will simply assume the requisite constitutional violations.

face of that knowledge, Orum failed to take clearly necessary steps to prevent Reaux's abuse of Major. This is a difficult task for Major, who was the first to report to Orum any sexual misconduct by Reaux. In a manner sufficient to survive summary judgment, Major has not shown how Orum could have foreseen any problem before he made his own complaint. At oral argument, Major's attorney suggested that Orum should have been tipped off by rumors and complaints from alumni and faculty. This argument is belied by the summary judgment evidence. At most the evidence shows that Orum heard rumors and complaints in 1990, the year after Major's incident. Major's sole injury occurred before he spoke to Orum, so Orum's decision not to take more action on Major's complaint could not have caused Major further harm. Because Orum had no information that Reaux posed a threat to students, he could not have been deliberately indifferent.

2. McCord

McCord attempts to satisfy the first prong of the *Taylor* standard by arguing that Major's complaint put Orum on notice that Reaux was sexually molesting students. McCord contends that after Major's complaint, Orum failed to take steps that were obviously necessary to prevent Reaux's later abuse of McCord, manifesting deliberate indifference.

We agree that Major's complaint brought new data about Reaux to Orum's attention, but we do not agree that Major's allegations put Orum on the alert for the type of abuse of which McCord complains. In addition, given the nature of Major's complaint,

7

Orum's response was hardly indifferent. Orum interviewed both Major and Reaux and warned Reaux to monitor the gestures he made with students. Orum also knew that Reaux had gone to Major's home to discuss the incident with Major's mother and had heard nothing further from either Major or his mother. Orum's decision that no further action on Major's complaint was warranted was not a failure to take steps that were obviously necessary to avert harm to potential future victims. McCord also does not suggest that his sexual relationship with Reaux continued after he went to Orum, so Orum's action or inaction in response to McCord's complaint cannot have been the cause of any injury to McCord. And as we discuss next, Orum's actions after McCord's complaint were also not deliberately indifferent.

3. Hagan

After the complaint by McCord and the rumors about Armstrong, Orum had undoubtedly learned of facts or a pattern of behavior that pointed plainly toward the conclusion that Reaux was engaging in sexual activity with WHS students. It is also obvious that the action Orum took in response to this information was ineffective to prevent Reaux's subsequent mistreatment of Hagan. However, simple ineffectiveness is not enough to overcome qualified immunity. *Taylor,* 15 F.3d at 458.

Orum took more than a minimal amount of action in response to the complaints he received. He interviewed McCord, Armstrong, both their mothers, Reaux, and other involved faculty members. Orum was given inconsistent information by McCord, then was told by McCord's

8

mother that her son's relationship with Reaux was consensual and that Orum should drop his investigation. Nonetheless, Orum warned Reaux that Orum would recommend Reaux's termination if there was reason to suspect that he had taken part in even a consensual sexual relationship with McCord. When Orum questioned Armstrong, Armstrong denied any sexual relationship with Reaux; Orum spoke to Armstrong's mother anyway. Orum was not told by Armstrong's mother that she was suspicious that Armstrong had an inappropriate intimate relationship with Reaux but instead was told that she was concerned that Armstrong was being pressured to join competing WHS programs. Orum documented his investigations, reported his findings to his superiors and requested further direction. While the students point to extra precautions Orum could have taken that might have pre-empted Reaux from grabbing Hagan, they have not established that Orum did so little that he was deliberately indifferent. *See Taylor,* 15 F.3d at 457-58.

The students place a great deal of emphasis on the undisputed fact that Orum did not follow some of the procedures established in the HISD *Handbook for Principals,* which recommends steps a principal should take when a student reports a "sexual offense." However, the students have not persuaded us that all of the procedures listed in the *Handbook* were obviously necessary in light of both the complaints Orum had received and the result of his investigations. Thus, Orum's failure to precisely follow the *Handbook* does not itself establish that Orum was deliberately indifferent. After a careful review of the summary judgment

9

evidence, we conclude that there is no genuine dispute of material fact over whether Orum was deliberately indifferent to Reaux's abuse of these students.  As a matter of law, Orum is entitled to summary judgment on the basis of qualified immunity.

## B. 42 U.S.C. § 1985

In their Third Amended Complaint, the students allege that Orum and others conspired to "conceal from the public instances of known and/or suspected sexual abuse of students by various teachers," thus "depriving the Plaintiffs of their right to equal protection of the laws, or equal privileges and immunities under the laws...."  In denying Orum's motion for summary judgment on this claim, the district court found that "there is some evidence of a cover-up by teachers and administrators" and decided that "whether this conduct constitutes a conspiracy is best resolved after discovery and then by a jury."  On appeal, the students argue that the evidence already presented is sufficient to create a genuine dispute of material fact on this claim.[3]

In order to avoid summary judgment on their § 1985 claim, the students must put forth evidence of " "some racial or otherwise class-based, invidiously discriminatory animus in the conspirators' action.' "  *Garrie v. James L. Gray, Inc.,* 912 F.2d 808, 813 (5th Cir.1990), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 218 (1991) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct.

---

[3]The students have not asked for additional discovery, much less indicated why it is needed or how it would stave off summary judgment.  *See Krim v. BancTexas Group, Inc.,* 989 F.2d 1435 (5th Cir.1993).

1790, 29 L.Ed.2d 338 (1971)).  In their brief, the students point to a class consisting of an "endangered group" of "all males on the football team and other sport teams" under Reaux's coaching and state that Orum's behavior discriminated against students in general, with males being at a higher risk.

The students have failed to show, or even allege, that Orum was motivated by a class-based animus within the meaning of § 1985. First of all, a group consisting of male athletes, male students or all students is not the kind of class that § 1985 requires, unless the students can establish that Orum targeted this group *specifically because of* some protected common attribute, such as race or, perhaps, gender. *Bray v. Alexandria Clinic,* --- U.S. ---- , ----, 113 S.Ct. 753, 759, 122 L.Ed.2d 34, 46 (1993).  While it may be conceivable that the students would be able to make such a showing in a claim against Reaux, they have not done so against Orum.

In addition, the students have failed to assert or offer summary judgment evidence showing that Orum was inspired by a discriminatory purpose.  To violate § 1985, Orum must have had more than an awareness of the consequences of his actions;  he had to have "selected or affirmed a particular course of action at least in part "because of,' not merely "in spite of,' its adverse effects upon an identifiable group."  *Id.* --- U.S. at ----, 113 S.Ct. at 760-761, 122 L.Ed.2d at 47-48 (quoting *Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)).  The students have not shown such a purpose.

In sum, the students have failed to identify a genuine dispute over any fact material to their § 1985 conspiracy claim. Therefore, Orum is entitled to summary judgment on the basis of qualified immunity on this issue as well.

For the reasons given above, we REVERSE the district court's denial of Orum's Motion for Summary Judgment and REMAND for entry of judgment in Orum's favor and further proceedings consistent with this opinion.